# James Vlahakis

| | |
|---|---|
| **From:** | James Vlahakis |
| **Sent:** | Monday, March 2, 2020 4:59 PM |
| **To:** | Weller, Jennifer |
| **Subject:** | RE: Judge Dow hearing 3-4/ report 3-2 |

Hello Jen,

In light of the huge disconnect we had on Friday, I will be filing my own report in for Judge Dow.

The following introduction of sorts should help explain why we are at loggerheads. As a former defense attorney, I know the delay tactics used by the defense bar. For example, the game of "give as little information out as possible, until told to by a judge" (quotation unattributable). Delays in discovery relative to busy caseloads were one thing, but delays for the sake of delay, fueled by scorched earth objections was expensive for clients and the courts. Motions to compel wasted court time and public resources. Failing to dig deep enough or taking a client at its word did not help advance cases. Saying, "it's my understanding from my client that ..." was code for "you can't be mad at me or seek sanctions against me if my client misinformed me." I wish I could remember the judge who admonished a municipal attorney by saying, "get the facts yourself, don't rely on what your client wants you to know or say".

I should also note that I am also writing this email for a future audience, a court who may review a fee petition and see how I urged you to cut to the chase and avoid wasting your client's money (money they are fit to waste), and the court's time. Saving judicial time is what I've been driving at. Here are a few thoughts to consider:

1. As detailed below, even before Friday and your overly literal approach to Judge Alonso's order, **I was very reluctant to accept your below proposal where up to the time of your proposal you hardly did anything to advance any of these cases towards or away from arbitration.** Further, in no way have you suggested that you will do anything to help move this case forward if I follow all of your below approaches.

2. And as detailed below, **my reluctance to accept your below open-ended proposals is supported by the fact that I have observed Midland's zealous defense in *Pierre v. Midland*.** Notably, despite losing any almost every point in this case, Midland is unwilling to throw in the towel and settle.

3. **My reluctance to accept your open-ended proposals is largely based upon the fact that think we should litigate our cases consistent with FRCP 1.** FRCP 1 provides that the Federal Rules of Civil Procedure should be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." I guess that's within your client's rights to pay you to avoid liability, as long as what and how you are defending is *consistent* with FRCP 1, 16, 26 and 37. Your well-honed and practiced approach is not consistent with the Rules as I discuss in the following section.

4. And considering the fact that the 7th Circuit reversed the district court on 1692f8, **what is your strongest defense going to be? What are is Midland really fighting about?** What will you say when a court asks you why you are fighting where your client does not have an enforceable arbitration agreement or not arbitration at all?

    a. **If it's arbitration, let's figure out (in a collaborative manner) which cases should be arbitrated, and which should not**. Here are a series of questions – that can apply to all cases - for figuring this issue out:

        i. "does the original creditor even have an arb agreement?",
        ii. "what do the terms say, do they apply to future collection disputes?"
        iii. "does the original creditor's arb language apply to assignors?",
        iv. "is the right to enforce arbitration rights conveyed or restricted by the debt purchase agreements?",

     v. "has Midland lost arbitration before a judge where the same terms and conditions are at play, and is Midland trying to get a better ruling this time?",

     vi. in fairness to Midland, "has Midland won arbitration on a case on all fours where the same terms and conditions and arb terms are in play?", or

     vii. stepping back for a moment, "did Midland when without producing debt purchase agreements?"

  b. **Here's another point to consider - legal opinions involving Midland motions to compel arbitrations knows that a court's ruling generally boil down to what the debt purchase agreements say**. Put another way, a Midland won't win simply by saying "your honor, it's a Synchrony Bank debt and we step into Synchrony's shoes". Instead, issues are more detailed and <u>creditor specific</u>:

     i. who the credit card issuer is?,

     ii. what choice of law applies?,

     iii. which particular store-branded card is at issue?,

     iv. what version of the terms and conditions are at issue?

     v. when did Midland purchase the debt? and

     vi. what does the debt purchase agreement say?

     vii. Has someone actually read close to 100 decisions involving Midland losing and winning arb motions? I think you now know the answer.

5. **You desire to consolidate is perplexing where you dangle no carrot. Here are a few questions and points to ponder:**

  a. What does the class get in return for lining up like placid ducks in the face of your consolidation request?

  b. In relation to *Pierre v. Midland*, I witnessed first had how you tried to create one class among a handful of class actions – all to skirt the fact that it is lawful for Midland to face dozens of class actions. Your approach to defending Pierre is contrary to *Mace v. Van Ru Credit Corporation*, 109 F.3d 338, 341-44 (7th Cir. 1996)

  c. You want me to agree to consolidation, but nearly two years into litigation **Midland won't answer simple, non-fatal questions**. For example, Jen has failed to answer a simple question authorized in Judge Dow's case involving Mr. Preston; the size of the class size. And I don't see how you could (until recently) ignore my simple questions about arbitration (where the right answers will lead to voluntary dismissals and cost savings to your clients) and then ask me to follow your below listed approach. *Why not eliminate cases and save your client time and money?*

6. **What Does Midland's goal with reassignment for purposes of discovery? For example,** You've asked me to submit a consolidated complaint. Please explain what you mean by that?

  a. Will the consolidated complaint you envision include classes not subject to arbitration?

  b. Will the consolidated complaint include classes for people suffering from actual damages.

  c. Will the consolidated complaint serve to include counts and classes where the terms and conditions have been found to not apply to a Midland debt buyer/assignee.

  d. I need to trust you to some extent. To date, I have my reservations:

     i. Preston was issued on a Tuesday afternoon. When Judge Gettleman asked David the following Thursday money what Midland was considering, David said he had not even spoken to Midland about the case. That surprised everyone in the courtroom;

     ii. David advised Judge Bucklo about certain comments that Judge Dow made on the record, but when I explained in simple terms what Judge Alonso had ordered Midland to respond by a date certain relative to whether it would seek to arbitrate, David got defensive and hostile and surprisingly suggested that he was unaware of what took place before Judge Alonso. I find that hard to believe where Jen and I saw both judges minutes apart. Maybe Jen forgot to tell David. We have bigger issues to deal with.

7. **Has Midland even considered global settlement?** Has Midland considered settlement where it knows it does not have an enforceable arbitration agreement or not arbitration at all?
    a. **Midland's defense is premised on a faulty notion – that debtor's don't read letters:**
        i. If debtors don't read letters as Jen claimed, why on earth did Midland go to the trouble of including language on envelopes and formatting letters like they do. Discovery will uncover all of this.
        ii. I'm sorry if I sound like I'm on a soapbox, but 1692f8 lists *prohibited conduct*? Why skirt the law and take the risk?
        iii. Maybe there is a reward to debt collectors who push the limits. The website is no longer running, but a few years ago Encore posted research on perceptions and emotions of debtors.
    b. **Why did you not raise Article III standing before the district court or on appeal** (the Seventh Circuit affirm on any ground on appeal)?
        i. You may desire to invoke the over-used *Spokeo* defense after losing the appeal, but I question whether how the Seventh Circuit would view such a defense when you could have raised in on appeal;
        ii. the Seventh Circuit has an obligation to *sua sponte* raise Standing, if it is concerned that Standing is lacking;
        iii. We may or may not know why you did not raise standing during the pendency of the appeal, but the opportunity existed where other defense lawyers raised the defense and the Seventh Circuit issued to pro-defendant Article III rulings *after* oral augment and *before* the CFPB chimed in. *See Lavallee v. Med-1 Sols, LLC*, 932 F.3d 1049 and *Cassillas v. Madison Ave Assocs., Inc.* 932 F.3d 329 (7 th Cir. June 4, 2019).
        iv. We will never know if this case could have been shot down (as pled) under *Spokeo*. I guess I'll see what happens when I face off against other attorneys in other parts of the country that may be more friendly to *Spokeo* arguments (not to say the 7th Cir. is unfriendly or otherwise unfavorable.

8. **Back to my main point. I've observed how *Pierre* was defended** (road block after road block, hardly agreeing to anything). In particular,
    a. Midland claimed *Pierre* was not classable, tossing randomly plucked arb agreements, squirting black ink like an octopus in an effort to cloud the issue or worse. Judge Leinenweber did not fall for it. There will be no repeat of *Pierre*, as long as I can avoid the time-wasting arguments;
    b. I witnessed Midland's approach to settlement during the *Pierre* settlement conferences and the lead up to the conferences;
    c. I receive and review all of the ECF filings in *Pierre*;
    d. I watched almost all of the trial and I witnessed how the jury reacted to what was argued. In particular, I listened to arguments in support of including certain documents into the records and was surprised why some documents were chose or chosen over others; and
    e. I've read all of the post trial and appellate filings. My point is that I'm prepared for what's to come.

9. **The following observations of unfortunate in-court and out of court behavior help explain why we will likely require court intervention to solve our differing views on how best to litigate these cases in conformity with FRCP 1.**
    a. Both you and David appear to want to drag everything out and get everything that you want, *without offering anything in return*. That's not cooperation, and what you're asking for in your desire to consolidate (w/o any details) is contrary to FRCP 1.
    b. I've witnessed the disdain the defense bar has for consumers, in **general**, and in relation to this case. See Para. d(iii)(a) below.
    c. Just like when I defended civil right cases, I never saw litigation it as "us (the defense bar and our clients) against "them" (plaintiff's and their "liberal, do-gooder" attorneys).
    d. Litigation should not be personal. Instead, this case is about the FDCPA as it has been written.
        ii. The FDCPA tells debt collectors what they can and cannot do. Courts keep everyone in check.

      iii. Here, Midland won part and lost part of the appeal.
      iv. Here is where the "us vs. them" mentality has gotten toxic in relation to this case.
          a. Jen stormed off after our recent court appearance, expressing disdain for how the 7th Circuit created a circle split. As Jen walked into the elevator, she reiterated the incorrect belief that debtors don't read letters.

10. **Finally, your below proposal is inconsistent with FRCP 16.** Let's try to work on some issues before the status date. For example, let's try to see if consolidation can advance FRCP 16(a) which states in full:

    a) Purposes of a Pretrial Conference. In any action, the court may order the attorneys and any unrepresented parties to appear for one or more pretrial conferences for such purposes as:
    (1) expediting disposition of the action;
    (2) establishing early and continuing control so that the case will not be protracted because of lack of management;
    (3) discouraging wasteful pretrial activities;
    (4) improving the quality of the trial through more thorough preparation; and
    (5) facilitating settlement.

    And then we should talk about how consolidation (for discovery purposes only) may look in relation to FRCP 16(b)(3)(A)-(B) which in part provide for:

    *(3) Contents of the Order.*

    (A) Required Contents. The scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions.
    (B) Permitted Contents. The scheduling order may:
    (i) modify the timing of disclosures under Rules 26(a) and 26(e)(1);
    (ii) modify the extent of discovery;
    (iii) provide for disclosure, discovery, or preservation of electronically stored information;
    (iv) include any agreements the parties reach for asserting claims of privilege or of protection as trial-preparation material after information is produced, including agreements reached under Federal Rule of Evidence 502;
    (v) direct that before moving for an order relating to discovery, the movant must request a conference with the court[.]

11. In conclusion, since we all know that these cases have legs and that a lot is riding on them, we should have honest and fulsome discussions of how consolidation may work in relation to FRCP 1 and 16. But before doing so, I think you should promptly disclose which cases MCM intends to arbitrate and on what grounds. ***For example, has Midland won arbitration on the same branded card and the same debt purchase agreement?*** This is something Midland should know about.

James

---

**From:** Weller, Jennifer <jweller@hinshawlaw.com>
**Sent:** Wednesday, February 26, 2020 5:44 PM
**To:** James Vlahakis <jvlahakis@sulaimanlaw.com>
**Cc:** Schultz, David <dschultz@hinshawlaw.com>
**Subject:** Judge Dow hearing 3-4/ report 3-2

James,

I think your most recent correspondence is missing some steps. Before responses to pleadings are even relevant, we need to work out the below issues.

What is your position on the following:

    (1) relating Preston I, Preston II & III, Giuliano (x4?), Castle, Nash, Ruyyashi and Reynolds?

        -before Judge Ellis?

        -before Judge Dow?

    (2) getting Morgan to the NDIL?

    (3) assuming the matters are related, filing a consolidated complaint?


**Jennifer Weller**
Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500, Chicago, IL, 60606
Tel: 312-704-3025 | Fax: 312-704-3001
jweller@hinshawlaw.com | hinshawlaw.com



*Please note our new address

Hinshaw & Culbertson LLP is an Illinois registered limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.